```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

IN RE APRIL 13, 2015 GRAND JURY SUBPOENA        15 Misc. 102
                                                  O R D E R

------------------------------------X
```

**Sweet, D.J.**

Treating this April 17, 2015 letter as an application for an Order to Show Cause as to why the grand jury subpoena dated April 13, 2015 should not be modified, it is hereby:

ORDERED that the motion to quash or modify will be heard on April 28, 2015 at 10:00 AM before the Honorable Naomi Reice Buchwald as Part I Judge in courtroom 21A; it is further

ORDERED that any opposition by the Government will be served and filed on April 23; it is further

ORDERED that any reply by the estates of John and Barbara Caggiano will be served and filed on April 27; it is further

ORDERED that the articles subject to the subpoena will be held by the Government pending dispositions of the motion and further order of the Court; and it is further

ORDERED that this Order to Show Cause be served upon the Government by 5:00 PM on April 17, 2015.


Dated:  New York, New York
        April 17 2015

                                          _____
                                          Robert W. Sweet, U.S.D.J.

15 MISC 00102

## Barket, Marion, Epstein & Kearon, LLP
Attorneys at Law

666 Old Country Road, Suite 700  
Garden City, New York 11530  
[P] 516.745.1500 • [F] 516.745.1245

5 Columbus Circle, Suite 710  
New York, New York 10019  
[P] 212.972.1710 •  
[Send mail to Garden City]

www.barketmarion.com

April 17, 2015

Honorable Robert W. Sweet  
Part 1 Judge  
United States District Judge  
United States District Court  
Southern District of New York  
500 Pearl Street  
New York, NY 10007-1312




Re: In the Matter of the Second Subpoena, dated April 13, 2015, issued by Assistant United States Attorney Margaret Graham to Doyle New York to produce business records but which instead demanded the provision of property belonging to the Estates of John and Barbara Caggiano.

Dear Judge Sweet:

    This firm represents the estates of John and Barbara Caggiano ("Estates") and Margaret Tanchuck as Executor of the Estates. Ms. Tanchuck's, father, John Caggiano, died in 2009 and her mother, Barbara Caggiano, died in 2013. We are writing at the suggestion of Assistant United States Attorney Margaret Graham to request the Court's supervision over an aspect of the grand jury proceedings from which the above-referenced subpoena was issued and served by email (Exhibit A, attached).

    Through this subpoena, the federal government has insinuated itself into an actively contested ongoing civil case underway in Nassau County. (See the Verified Amended Complaint, Exhibit B.) That case is between Ms. Tanchuck, as Executor of her parents' Estates and the New York Public Library (NYPL), and it will resolve the question of who has legal title to several valuable items which have been in possession of the Estates of Ms. Tanchuck's parents for almost three decades—the same items that the above-referenced subpoena was in artfully deployed to seize. While the NYPL claims to have possessed them once, it concedes in an email message to appraiser Doyle New York (Doyle) that, in NYPL's "rough estimation," the Library lost possession of them sometime during a three-year window "between 1988 and 1991." And, over the course of nearly three decades, the NYPL made no efforts - none - to recover, or to list as lost, or to make an insurance claim for, or to report as missing to the police, or to ever

1

announce that the items were not in their possession, until Ms. Tanchuck, in the normal course of administering her parents' Estates, discovered them, and, as required as part of her duties as Executor, dutifully sought to have them appraised by expert appraisers at Doyle.

While conducting its necessary due diligence, in July 2014, Doyle contacted the NYPL and, for the first time in almost 30 years, the NYPL asserted a claim to title, based only on the NYPL's inability to produce any sort of documentation explaining how the items left their possession. The NYPL claim that no documentation exists is remarkable, as it is rooted in its admitted identical inability to account for the contested material for almost 30 years.

After the NYPL advanced its claims, Ms. Tanchuck and the NYPL began contesting rightful ownership through their lawyers. Those dealings culminated in a meeting between the Estates' counsel and attorneys representing the NYPL on January 29, 2015, during which the NYPL flexed its political muscle and threatened to deploy state police and federal investigators against the Estates and against Ms. Tanchuck personally. Unswayed by this questionable litigation tactic, and relying on the doctrine of laches as clearly explained in *Bakalar v. Vavra*, 819 F. Supp 293, 303(S.D.N.Y. 2011) which, in our view, firmly cements title in the Estates' favor, Ms. Tancheck on April 3, 2015, initiated a civil action (subsequently amended on April 9) in New York State court to request a declaratory judgment of clear title. The filing of the complaint was reported in the press. (See, e.g., the press report in Exhibit C.)

Then, with civil litigation underway, NYPL carried out its January threat. Counsel for Ms. Tanchuck received a call from AUSA Graham, indicating that she was investigating Ms. Tanchuck for a crime. Specifically, she stated that her investigation was centered, not on how and when the items at issue left the NYPL (because of course the NYPL admits there is no evidence of that), but instead on whether Ms. Tanchuck had violated 18 USC § 668, Theft of Major Artwork, by asking Doyle to appraise them. AUSA Graham characterized that as an effort to "dispose" of the material under the statute. Remarkably, AUSA Graham suggested that such conduct, acts which Ms. Tanchuck had a legal duty to undertake as Executor of her parents' Estates, might constitute a crime. She blinked at the fact that Ms. Tanchuck had already sworn in her Verified Complaint that she had no idea how the material had become part of her parents' Estates, nor did she have access to any relevant information, obviously because her parents were deceased and there was no documentation explaining the provenance. A simple reading of the federal statute makes clear that criminal liability only attaches upon a showing that the defendant "knows" the materials had "been stolen or obtained by fraud."

AUSA Graham informed the undersigned that, on or about April 6, 2015, Doyle received the first subpoena directing a Doyle representative to appear to give testimony before a grand jury and also to "hold" the items in controversy. Thereafter, on April 9, 2015, at 5:00 P.M. Ms.Tanchuck's lawyers filed an Order to Show Cause in New York State Civil Court demanding a hearing to address the conditions under which the materials could or would be maintained by

Doyle, and seeking an order requiring the material to be insured while it remained in Doyle's custody. In response, according to the email from AUSA Graham, at 6:08 P.M. that evening, she emailed a new subpoena (Exhibit A) to Doyle, ostensibly demanding Doyle to produce their business's "books and records," but actually requiring Doyle, instead, to produce only the contested items at issue in the civil case (and not demanding any business books or records at all). Then on April 10, 2015, a federal agent, acting on the U.S. Attorney's behalf, appeared at Doyle to collect the demanded items. Doyle, quite understandably wanting out of the dispute, did not contest this federal agent's demand. Thus, now, despite litigation being fought between the Estates on one hand and the NYPL on the other, over items previously held by Doyle New York, none of the interested parties now possess the contested items. Instead, they are now held by the federal government pursuant to AUSA Graham's "business records" subpoena, while acting as the NYPL's proxy to facilitate the Library's claim of ownership. On April 10, 2015, AUSA Graham called counsel for the Estates, leaving a message that the items had been seized, and suggesting that the Order to Show cause was unnecessary because Doyle no longer had them.

On April 15, 2015, undersigned counsel and his associate, Ria Rana, appeared at the office of AUSA Graham to discuss the case. During this discussion, we reiterated that the subpoenaed items were already the subject of an open and active civil controversy in state court regarding the doctrine of laches, statute of limitations, and rightful ownership. We provided documentation of the pending case and communications between Doyle and the Estates and between NYPL and Doyle. I asked for AUSA Graham's agreement that she would promptly return the items in accordance with the court's order, either to the Estates or the NYPL, depending on whom prevailed, when the state court determined who had title. She refused to agree and suggested that I pursue this route to address the issue.

Our proposal to AUSA Graham would allow the government to temporarily maintain possession over the contested items, notwithstanding several significant problems with its purported grand jury "subpoena." Grand juries have broad power, after all, but a grand jury subpoena is not a "talisman that dissolves all constitutional protections." *United States v. Barr*, 605 F. Supp. 114, 117 (S.D.N.Y. 1985) (citing *United States v. Dionisio*, 410 U.S. 1, 11 [1973]). Grand juries are intended for bona fide investigations, in other words, not for gaining leverage on behalf of other public institutions engaged in separate litigation. *See, e.g., United States v. Fisher*, 455 F.2d 1101, 1104-05 (2d Cir. 1972) (noting that the "grand jury is not meant to be the private tool of a prosecutor"). They are also not intended to be used merely to intimidate. *See United States v. Kelly*, 305 Fed. Appx. 705, 708 (2d Cir. 2009) (declining to quash a subpoena where it was not served "with intent to intimidate or harass"). Indeed, a "subpoena duces tecum may violate the fourth amendment if government agents improperly impinge on the defendant's right to contest the subpoena's validity or a court's authority to quash, alter or enforce it"; and, while a lack of notice alone is not decisive, "[w]hether the defendant has notice of the subpoena

3

is related to the opportunity to challenge the subpoena and is also a factor to be considered." *Barr*, 605 F. Supp. at 118.

Guided by those principles, and although the subpoena is clearly deeply flawed, we seek merely to modify it and not to quash it. Our goal is only to assure what AUSA Graham has refused to agree to, that is, to promptly return the contested items to the prevailing party after a court finally has decided who has title to them. The flaws in the subpoena are manifest, since it seems obvious that it was issued to give tactical benefit to NYPL's position in the ongoing state civil controversy. The items had been safe where they were; they were not at risk of being lost or damaged as <u>they were already the subject of a pending civil action that Ms. Tanchuck herself had commenced as Executor of the Estates.</u> The insinuation of law enforcement in exactly the way the NYPL inappropriately had threatened on January 29, 2015 is troubling enough. Moreover, those threats have now materialized in inappropriate grand jury subpoenas. A grand jury investigation is supposed to be a judicial proceeding, not the plaything of a well-connected institution.

Second, there is absolutely no basis to suspect the Executor, Ms. Tanchuck, of a crime—a point corroborated by the fact that her innocent state of mind *forms the basis of the Estates' claims in state court*. Plainly, if a person's intent were to knowingly turn stolen items into cash, he or she simply would turn to illegal markets. But Ms. Tanchuck instead went to one of the most reputable and respected appraisers in New York, where she knew an investigation into the items' chain of title would commence, in order to assure the Estates' ability to handle the items. And after learning of NYPL's claim of purported ownership, she came forward with a frank and detailed complaint publicly filed in state court with her name in the caption. Clearly, Ms. Tanchuck lacks the state of mind required for criminal prosecution, yet the government remains involved on behalf of the NYPL in the civil claims against the NYPL through the guise of a meritless investigation.

Third, even if the government had reason to investigate Ms. Tanchuck for a crime, it would still lack any need to maintain *continued* possession of the subpoenaed items. The government cannot learn anything more from its possession of the subpoenaed items about Ms. Tanchuck's *mens rea*, than it already knows; there is nothing intrinsic to the contested items which could shed light on Ms. Tanchuck's *mens rea*. Notably, the subpoenaed items are not business records comprised of extensive computer files or reams of complicated papers documenting relevant and contemporaneous business transactions. They are not business records at all; they are simply ancient artifacts.[1]

---

[1] Bizarrely, as can be seen, the subpoena requires the Doyle agent responding to attest to the items as "business records made at or near the times of the occurrence of the matters set forth in the record by, or from informal transmittal by a person with knowledge of those matters," which "were kept in the course of regularly conducted business activity," and "were made by the regularly conducted business activity as a regular practice." Obviously, what were seized are <u>not</u> business records, but rather are items which might have been sought by a warrant, if there

4

Certainly, we do not intend to rush the government through an investigation; that is why we proposed to AUSA Graham that she keep the contested items for the duration of Ms. Tanchuck's state court litigation, and then return the items to the prevailing party. Her refusal to agree to this common-sense approach tends to support the conclusion that her office is being used as a tool by the NYPL to gain an advantage in the civil litigation. That litigation will likely take months, if not years, to resolve. Such time should be more than sufficient for the government to decide what it wants to do.

When AUSA Graham refused to agree to return the items to the adjudged title holder at the end of the case, we became concerned. At that point, she explicitly invited counsel to seek the supervision of this Court. Accordingly, we now ask the Court to supervise the government's grand jury proceedings in this matter, to the extent necessary to prevent the contested items from prolonged seizure and detention by the United States government, beyond the conclusion of the Estates' state claims. The Court has inherent authority to conduct such supervision to prevent the perversion or misuse of the grand jury process. *See, e.g., In re Grand Jury Investigation (General Motors Corp.)*, 32 F.R.D. 175, 181 (S.D.N.Y. 1963) ("The grand jury is subject to control and supervision of the court. General Motors' claim of abuse of process, even absent *locus standi*, is sufficient to invoke this court's inherent power to supervise the grand jury so as to prevent the perversion of its process"). This is especially true here, where the central issues involve subpoenas—which through the threat of contempt explicitly secure compliance by summoning the Court's authority.[2]

In short, we request that through the Court's inherent authority to supervise, or through a subpoena modification order, the Court ensure that the contested items be returned to the party adjudged to be the title holder at the conclusion of the New York State civil action.

Sincerely,

Daniel N. Arshack, Esq.

---

were sufficient basis to support one, or by seizure and subsequent forfeiture if there were a basis to believe they were proceeds of crime. But there is no such basis. In any event, with regard to the improvident subpoena, it is respectfully suggested that such an attestation from personal knowledge would be impossible, since the written "records"—a ledger connected to Ben Franklin, and various books of the Old and New Testaments—purport to describe transactions conducted in Philadelphia nearly three centuries ago, or events that reportedly occurred not later than two millennia ago. In this case, however, there is no evidence of any crime. According to the NYPL, which has never claimed a theft, there are merely no records. No one knows how the items left the library almost 30 years ago. They may have been sold or traded and the records lost, or they may have been stolen and the library did nothing about it. There is no ground to favor one conclusion over the other. What is clear, however, is that the items have been in the Estates' possession for approximately 30 years. Who should have title to the items is what the civil action is intended to resolve.

[2] To the extent the Court declines to rely upon its inherent supervisory authority over the grand jury, we request, in the alternative, that pursuant to Fed. R. Crim. P. 17(c)(2), the Court simply modify the subpoena to impose a time limitation on the government's authority to maintain possession over the items.

CC: <u>By Hand</u>
A.U.S.A. Margaret Graham
1 St. Andrew's Plaza
New York City, NY 10007