# Barket, Marion, Epstein & Kearon, LLP
Attorneys at Law

666 Old Country Road, Suite 700　　　　　　　　　　　　　　5 Columbus Circle, Suite 710
Garden City, New York 11530　　　　　　　　　　　　　　　New York, New York 10019
[P] 516.745.1500 • [F] 516.745.1245　　　　　　　　　　　　[P] 212.972.1710 •
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　[Send mail to Garden City]

www.barketmarion.com

April 27, 2015

Honorable Sidney H. Stein
United States District Court Judge, Part 1
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

　　　　Re:　　Reply to government's April 23, 2015, letter opposition, *In Re: April 13, 2015, Grand Jury Subpoena*

Dear Judge Stein:

　　　　This firm represents Maggie Tanchuck, as executrix of her parents' Estates, in connection with the above-referenced matter. We are writing in reply to the government's opposition letter of April 23, 2015 (the "Letter").

　　　　The central issue is whether the federal government may keep property that it claims was stolen even after its investigatory need ends and, moreover, even after a state court decision has vested title to the contested property. The answer has to be no. This issue is before Your Honor due to the government's refusal to agree to this commonsense premise: In the event the current litigation between the Estates and the New York Public Library (NYPL), is resolved with the New York courts awarding clear title to Ms. Tanchuck as executrix, the government should be required to return the items to her without delay. Alternatively, if NYPL prevails in the litigation, the government should be obligated to return the property to the NYPL. The government's refusal to agree to this basic proposition during our meeting with the government on April 15, 2015, and its April 23, 2015, letter to the Court, shows the need for this court's intervention exercising its supervisory authority.

　　　　In its April 23 letter, the government describes various valuable items that it claims were "stolen"[1] from the New York Public Library—a point the Library cannot "confirm," though it asserts it is the true owner.[2] The government describes indicators that the items sought were once in the NYPL's possession[3] and it proceeds to assert that Ms. Tanchuck's state court action

---

[1] See Government Letter, at 2.

[2] See Government Letter, at 1 ("The Library confirmed that the Items were theirs . . . .").

[3] See Government Letter, at 1.

1

lacks validity because, under the government's faulty analysis, her laches defense is unsound.[4] From this untenable foundation, the government leaps to the assertion that this Court lacks the power to supervise its own grand jury because *ipsi dixit* the government investigation is in "good faith,"[5] and because Ms. Tanchuck has not shown any reason why the government's subpoena is unreasonable.[6] Ms. Tanchuck is not entitled to a return of the property under Rule 41(g), it continues, because she has demonstrated neither entitlement to the property, nor that the government's seizure was illegal, nor that the government's continued need for the property has ended.[7] All these arguments are designed to avoid dealing with the single question, stated above, which is squarely before the Court.

  First, the government's letter whips a straw man. Ms. Tanchuck is not demanding a return of the items *now*; she is demanding a return of the items months, if not years, from now and, even then, *only* if the New York Court system first vindicates her claim to title. In that case, there would be no question as to her "lawful possession of the seized property,"[8] because her state case will resolve who has lawful title. Moreover, given the gulf of time between now and the conclusion of her state case, the government should have no need for even more time to decide what to do.[9] The government's focus on whether Ms. Tanchuck has "demonstrated that [she] [is] entitled to the lawful possession of the Contested Items," and on its need to "further its investigation" misses the point. *See* Government Letter, at 4. By the time Ms. Tanchuck's state case has concluded, "lawful possession" will have been fully adjudicated, and the government will already have had months, if not years, to "further its investigation." After all, in New York, the state court settles questions of title, not the federal grand jury.

  Second, the government's argument tries to prove too much. It has demonstrated how little time it might require for this investigation. The government seems, after all, to have had enough time already to piece together thirty years of history to authenticate the items,[10] to determine who they belong to,[11] to pronounce them definitely stolen,[12] and even to prognosticate

---

[4] See Government Letter, at 2, fn1.

[5] See Government Letter, at 3.

[6] Id.

[7] See Government Letter, at 3.

[8] *See* Government Letter, at 4 (citing *Ferreira v. United States*, 354 F. Supp. 2d 406, 409 [S.D.N.Y. 2005]).

[9] See Government Letter at 4 (describing, as an element to Rule 41(g) claims, that the seizure was either illegal or "the government's need for the property as evidence has ended").

[10] See Government Letter, at 1 (describing "eight priceless books [including] a workbook for Benjamin Franklin's printing house from 1759 to 1776," and that the items have "several readily observable indicators" linking to the New York Public Library).

[11] See Government Letter, at 4 (stating that the Contested Items "are the property of the Library").

[12] See Government Letter, at 2.

2

how this complex title-contest in state court will end.[13] All of this after the government has been in possession of the items for a mere **ten days**. One wonders why the government would need more months, if not years, of possession and control over items about which it has already made such robust conclusions.[14]

The Estates and their executrix recognize that, in reality, and notwithstanding the government's simplistic depiction of the legal landscape, the situation is likely not to change significantly in the near future, pending the outcome of the state title-quieting action. That is why Ms. Tanchuck is willing to leave the items in the government's possession pending the outcome of the state litigation.[15] Given what the government already knows, this undoubtedly lengthy time period should be more than sufficient to allow the government time to decide how it wants to proceed. If Ms. Tanchuck's state litigation ends, and the government still has not pressed charges, the federal government should respect the state court's finding and convey the items to the party with clear title. That is all we are asking in this motion.

Third, the government's analysis of Ms. Tanchuck's laches defense adds little to assessing the validity or reasonableness of the subpoena, except that it shows that the federal government clearly favors the NYPL in the current title controversy even before a judicial determination vesting title has been made. What is more, the government's legal analysis is sorely lacking and utterly incorrect. It selectively cites to some inapposite language in the landmark decision, *Solomon R. Guggenheim Foundation v. Lubell*, 77 N.Y.2d 311, 320 (1991), which, divorced from context, seems to support the library's claim to the items. "To place the burden of locating stolen artwork on the true owner," the government quotes, "and to foreclose the rights of that owner to recover its property if the burden is not met would … encourage illicit trafficking in stolen art." *Id*. But the government either seriously misunderstands or intentionally neglects to state that this language stems from *Lubell*'s analysis of a statute of limitations issue, not laches. The language that the government conspicuously and intentionally

---

[13] See Government Letter, at 2, fn.1 ("Petitioner's laches argument does not appear to be consistent with governing New York case law").

[14] In this regard, the Government's classification of the contested items as "stolen books," that the Library was able to "confirm" that the items were "theirs," and that the Library *must* have lost the items as a result of "theft," is a fervently one-sided view of the facts. Obviously, at this point, the NYPL itself can only guess what happened to the items, as its record-keeping was so feckless that it failed to even realize the items were not in their possession until Ms. Tanchuck found them in her parents' estates and brought them to Doyle. The NYPL has not suggested that there is evidence of *any* theft. They have only said that they have not been able to find any records of a legitimate transfer. The fact that the books have not been in the NYPL's possession for almost 30 years does not establish a theft. If the NYPL had ever claimed a theft, or announced that the items were lost, or ever expressed any concern about the items' whereabouts, during that almost 30-year period the situation might be different. Instead, the NYPL did nothing. Their silence might well be evidence that the books left the NYPL in an ordinary and legal manner. The simple fact could be that they just cannot find the records of the legal transfer. Of course, over the course of nearly three decades the NYPL would have done *exactly* what they did do if the books *had* been sold or traded… nothing. The NYPL alleges that there was a theft based *only* on its inability to locate any records of having sold or transferred the items. Obviously, though, the NYPL's ability to track and maintain its materials, including the items at issue in this case for almost 30 years appears imperfect, to say the least. See, also, http://noticingnewyork.blogspot.com/2015/04/plight-of-genealogy-researching-cousin.html

[15] By so consenting, neither the Estates nor Ms. Tanchuck as executrix of those estates waive any rights or remedies in the event that the items seized by the government are lost or damaged while in the government's custody.

omits from its recitation in the *Lubell* decision actually disparages the position that the government now takes—it says, instead, that the statute-of-limitations analysis ***should not be relied upon for adjudicating a laches defense***:

> Despite our conclusion that the imposition of a reasonable diligence requirement on the museum would be inappropriate for purposes of the Statute of Limitations, our holding today **should not be seen as either sanctioning the museum's conduct or suggesting that the museum's conduct is no longer an issue in this case.** We agree with the Appellate Division that the arguments raised in the appellant's summary judgment papers are directed at the conscience of the court and its ability to bring equitable considerations to bear in the ultimate disposition of the painting. **As noted above, although appellant's Statute of Limitations argument fails, her contention that the museum did not exercise reasonable diligence in locating the painting will be considered by the Trial Judge in the context of her laches defense.** (emphasis added)

*See Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 321 (1991).[16]

Such a distortion is consistent with the government's biased drive to "investigate" Ms. Tanchuck, who, in handling her deceased parents' estates, obviously did nothing other than what the law requires, regarding the duties of Executors like her. Indeed, this application to the Court has been filed in furtherance of such duties. The Court should exercise its inherent authority to

---

[16] The government goes on to cite *In re Flamenbaum*, 22 N.Y.3d 962 (N.Y. 2013), out of context as well. In *Flamenbaum*, a range of items were pillaged (stolen) from a museum during World War II. Because of the number of stolen items, the museum explained that it did not report the stolen items to authorities because "it would have been difficult to report each individual object that was missing after the war." *Id.* at 965. Moreover, the estate did not show that the museum would have been able to recover the items if it *had* reported the items missing. Further, the Flamenbaum estate was unable to demonstrate prejudice, unlike in this case, because the decedent's son was aware that the item had belonged to the museum. In this case of course, until informed by Doyle that the objects had once belonged to the NYPL, Ms. Tanchuck had no idea of the item's provenance. Nevertheless, in describing *Flamenbaum*, the government ignores the weight of these factors in the court's decision. Instead, it misleadingly poaches one factor—that the estate did not show the museum would have been able to recover the items if it had reported the items missing—without analyzing the relevance of that factor at all to the present case, and it does not even mention the other two factors, which here would squarely support Ms. Tanchuck's claim.

The NYPL, of course, is not a war-pillage victim. Also, as a result of the NYPL's lack of any diligence, literally every Tanchuck family member (and indeed every NYPL employee, apparently) with direct knowledge of these items is now deceased and therefore unable to explain the manner of the transfer of the items out of the NYPL's possession and into the possession of the estates of Ms. Tanchuck's parents. In this regard, a better analysis of the issues presented in Ms. Tanchuck's New York claim is *Bakalar v. Vara*, 819 F. Supp.2d 293, 303 (S.D.N.Y. 2011), which describes the validity of a laches defense thusly: "Of the greatest significance is the death of Mathilde Lukacs in 1979, perhaps the only person who could have elucidated the manner in which she came to possess the Drawing, or indeed, whether she owned it at all." Here, Ms. Tanchuck has suffered the same prejudice, through the deaths of both of her parents—and now made worse because her inability to trace the source of the contested items has inexplicably and unfairly landed her as a target of a biased federal investigation.

curb this sort of overreaching. *See*, *e.g., In re Grand Jury Investigation (General Motors Corp.)*, 32 F.R.D. 175, 181 (S.D.N.Y. 1963) ("The grand jury is subject to control and supervision of the court. General Motors' claim of abuse of process, even absent *locus standi*, is sufficient to invoke this court's inherent power to supervise the grand jury so as to prevent the perversion of its process").

Fourth, the government overlooks the most significant lesson from the *Lubell* and *Flamenbaum* cases: In neither case did federal investigators inject themselves into the civil controversy. The government's conduct here, by contrast, is truly unjustly aggressive. In those other cases the federal government respected federal-state comity. We ask the Court likewise to be guided by considerations of comity here, since the government seems disinclined to do so. Comity should allow the state litigants to proceed without inappropriate and heavy-handed prosecutorial interference. Unlike in *Lubell* and *Flamenbaum,* here we see no similar restraint.[17] We have, instead, a well-connected institution demanding to get its way via threats of penal intervention, and then federal prosecutors bowing to those inappropriate threats by dangling the prospect of a grand jury investigation and weighing in with threats of indictment. As indicated in our initial motion, the United States Attorney's Office should not be permitted to conscript the grand jury process in order to help its friends gain an edge in civil litigation. *See, e.g., United States v. Fisher*, 455 F.2d 1101, 1104-05 (2d Cir. 1972) (noting that the "grand jury is not meant to be the private tool of a prosecutor").

Finally, the government's arrogance burns bright when it insinuates that, because it has already successfully taken possession (albeit via a faulty subpoena) which *explicitly* called for the production of the "business records" of Doyle but which nonetheless seized only rare books--Ms. Tanchuck lacks any redress. *See* Government Letter, at 3. If this notion were seriously credited, the government would be free to intimidate (as they did in this case) third-parties into turning over any property, effectively banishing from the process any rightful owner who happened to be absent when the government seized the items. Indeed, that does appear to be the tactic here. The subpoena to third-party Doyle which called for the production of Doyle's business records, with no advanced notice to Ms. Tanchuck, resulted in the seizure of the contested items from Doyle by federal agents who showed up on Doyle's doorstep. That subpoena even admonished Doyle not to tell anyone that the government was seeking the material it took, thereby encouraging Doyle to breach its fiduciary duty to Ms. Tanchuck. Of course, this is the opposite of what federal law actually directs. Under Federal Rule of Criminal Procedure 17(c), compliance with a subpoena is unreasonable or oppressive when "the manner of service strip[s] the court of its authority to oversee the subpoena process and denie[s] the defendant the opportunity to challenge its validity." *United States v. Barr*, 605 F. Supp. 114, 118 (S.D.N.Y. 1985) (citing *In Re Nwamu*, 421 F. Supp. 1361 [S.D.N.Y. 1976]). But that is what the government seeks here. It has subpoenaed business records and instead seized rare books without notice to the owners, and then tried to deny those owners opportunity to contest the subpoena or to seek meaningful judicial oversight.

---

[17] In footnote 3 of its letter, the government makes several contentions about the sequence of events surrounding the subpoenas in issue. Suffice it to say, the government's recollection of these events is troublingly flawed—as can be demonstrated, if necessary, through notes that were taken contemporaneously with government communications and the actual telephone message left by the Assistant United States Attorney when she called the offices of the undersigned.

The Court possesses inherent authority to prevent civil litigants from importuning the United States Attorney's office to become its private claim enforcement agency. Likewise the Court has the authority to prevent the United States Attorney's Office, as in this case, from turning grand juries into weapons against private civil litigants. The Court possesses authority under Rule 17(c) to modify the subpoena to render it more reasonable. And if the government is correct that these matters are best governed by Federal Rule of Criminal Procedure 41(g), even then, the Court would have authority to order the return of the items to the true owner, under the conditions suggested here. Accordingly, in the event Ms. Tanchuck's claims over the contested items are vindicated in state court, she respectfully requests that the government be required to return the items to her.

Respectfully,

Daniel N. Arshack